IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

BILL TURNER,

    Plaintiff,

v.                                           No. 15-CV-827 MCA/SMV

EMERALD CORRECTIONAL
MANAGEMENT, LLC, aka LINCOLN
COUNTY DETENTION CENTER;
ARTHUR ANDERSON, Warden of the
Lincoln County Detention Center, in
both his individual and official
capacities, LT. MOLLY GODINEZ,
aka "Lori Beth Becker Godines",
an employee of the Lincoln County
Detention Center, in both her
individual and official capacities,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Defendant Arthur Anderson's, in his Individual Capacity, Opposed Motion for Summary Judgment*. [Doc. 65] The Court, having considered the submissions, the relevant law, and being otherwise fully advised in the premises, hereby **GRANTS IN PART** and **DENIES IN PART** the *Motion*.

**BACKGROUND**

From January 10, 2014 to July 9, 2014, Plaintiff Bill Turner was a pre-trial detainee housed at the Lincoln County Detention Center (LCDC). [Doc. 65-6, p. 3; Doc. 65, Defendant's Material Fact 26] Through an affidavit by another inmate, John Ogden, who was incarcerated at LCDC during the same period as Plaintiff, Plaintiff submitted

1

evidence regarding the unsanitary habits of another inmate, referred to as AH. [Doc. 66, p. 13, ¶ 1] Mr. Ogden states that he was in the same housing unit (Bravo) as AH and that "AH would spread his feces and urine all over the showers, the toilet, and the day room, and he would spread his food around also." [Doc. 66, p. 13, ¶¶ 3-4] He states that he, Plaintiff, and other inmates each "cleaned up after AH some." [Doc. 66, p. 13 ¶ 5] He further stated:

> 6. The guards would not give us gloves to clean up the feces, etc. of AH. They gave us a bucket of water, a dirty mop, and a broom, once a day in the morning. We asked for gloves and bleach and a scrub brush and they always said "we don't have any." I never saw any additional small spray bottles accompanying the bucket.
>
> 7. I put up with this situation of AH and his unclean habits and LCDC not helping us clean up the mess for awhile, probably a month or so, and then I started complaining to the guards about it. I told them it was not our (the inmates) job to clean up after AH, that there is no policy and nothing in the Handbook that says that is our job that we have to clean up after AH. I told them that it was LCDC's responsibility and duty to provide us with a safe and clean environment.
>
> 8. When Warden Anderson would come by and visit the day room, I complained to him about AH and having to clean up after him. He said, "if you bring his (AH) name up again, I'll put you in seg." "Seg" is short for "segregation." He did in fact put me in segregation. When he would come around to segregation, I would talk to Warden Anderson about it. I would say "why am I in seg for something that I didn't even do? You are putting AH in there and putting us in harm's way health-wise and safety-wise" and Warden Anderson would say that he "didn't want AH to be in segregation because then his guards would have to wash him and clean up after AH all the time." Because I kept complaining about having to clean up after AH, the Warden himself kept me in segregation.
>
> 9. I went back and forth between Bravo Unit and segregation. They would occasionally take AH out of Bravo Unit and put him someplace else. Whenever they took AH out of Bravo, they would take me out of segregation and put me back into Bravo. When they were ready to put AH

back into Bravo, they would take me out of Bravo and put me into segregation again.

10. . . . We [inmates] complained about it for so long that they finally after about seven (7) months the guards would come by about once per week and spray bleach on the sinks and toilet and shower and then we would have to scrub and clean it. They did this for about two (2) months, and I believe those two months were August and September of 2014, and then after these two months were over they went back to not giving us any bleach at all.

[Doc. 66, pp. 13-14] At his own deposition, Plaintiff stated that he asked a lieutenant for cleaning supplies, and that she refused to provide them, but he did not know whether that decision came from Warden Anderson.[1] [Doc. 65-6, pp. 5, 7]

Shortly before being released, Plaintiff developed bumps like pimples or "an infected hair bump" on the back of his neck. [Doc. 65-6, p. 5] After he was released, he saw a doctor who diagnosed him with methicillin-resistant *Staphylococcus aureus*, commonly called MRSA. [Doc. 65-4, ¶ 13]

Warden Anderson, the only remaining Defendant, testified that he is a "hands-on" administrator. [Doc. 65-7, p. 2; Doc. 65-2, ¶ 3] He was made aware that one inmate contracted MRSA at the LCDC, however, the Warden was made aware of the infection about six months after Plaintiff was released from custody. [Doc. 65-2, ¶¶ 6-7; Doc. 65-

---

[1] Plaintiff quotes a portion of a deposition of Victor Rodriguez in his *Answer to Defendant's Motion for Summary Judgment*, however, Plaintiff failed to attach the portion of the deposition as an exhibit. When "a party fails to properly support an assertion of fact . . . the court may: . . . give an opportunity to properly support or address the fact," grant summary judgment, or "issue any other appropriate order." Fed. R. Civ. P. 56(e). The Court exercises its discretion to disregard the unsupported factual assertions. Further, Plaintiff failed to comply, both in format and in substance, with D.N.M.LR-Civ. 56.1(b) with regard to setting forth additional facts upon which the non-movant relies.

7, pp. 3, 5] Emerald Healthcare Systems, L.L.C., the medical contractor, did not inform Warden Anderson of a "staph outbreak" in the detention center. [Doc. 65-7, pp. 3-4]

Prior to his incarceration, Plaintiff was treated by Dr. Banikarim, M.D. [Doc. 65-3, p. 3] She saw Plaintiff on December 6, 2011, and her notes from that date do not indicate that Plaintiff had MRSA symptoms, nor do they mention any test for MRSA colonization. [Doc. 65-3, p. 3]

Defendant relies on an affidavit by Dr. Rabih Darouiche, M.D. [Doc. 65-4] Dr. Darouiche is "board-certified in Infectious Disease, Internal Medicine and Spinal Cord Injury medicine." [Doc. 65-4, ¶ 2] Dr. Darouiche states that when staphylococcal bacteria reside on or in the human body it is called colonization. [Doc. 65-4, ¶ 6] "Not all people who are colonized with MRSA will develop an infection." [Doc. 65-4, ¶ 6] Infection occurs when "the bacteria have caused symptoms and signs such as fever, skin lesions, etc." [Doc. 65-4, ¶ 6] Dr. Darouiche attests that "approximately 31.6 percent of the American population is colonized with MRSA" [Doc. 65-4, ¶ 7], and that a special test is required to detect MRSA colonization. [Doc. 65-4, ¶ 8] "MRSA is primarily spread when a person's open skin comes in contact with the skin of a person who is colonized or infected with MRSA" or "with a surface contaminated with MRSA." [Doc. 65-4, ¶ 10] "*Staphylococcus aureus* is not a usual organism present in human stool. Therefore, MRSA is usually not spread by feces and it is highly unlikely, if not impossible, that MRSA can be spread by surfaces contaminated with human feces." [Doc. 65-4, ¶ 11]

Dr. Darouiche also attests that no competent physician can determine where Plaintiff acquired "the MRSA strain in this case." [Doc. 65-4, ¶ 12] Dr. Darouiche explains that MRSA can incubate for days, months, or years, and that "Plaintiff could have been colonized with MRSA for a number of years prior to entering LCDC," or he could have "acquired MRSA after his release from the jail." [Doc. 65-4, ¶¶ 12-13] Dr. Darouiche states that Dr. Banikarim's records do not indicate that she tested Plaintiff for MRSA colonization. [Doc. 65-4, ¶ 9] Thus, Dr. Darouiche states that it is not scientifically reasonable to determine that Plaintiff contracted MRSA at LCDC. [Doc. 65-4, ¶ 13] Finally, Dr. Darouiche opines that, even if Plaintiff contracted MRSA at LCDC, "there are no facts to suggest that anything LCDC did or did not do in any way contributed to the conversion of MRSA presence." [Doc. 65-4, ¶ 15] He notes that "MRSA can be present in any facility despite the most thorough sanitation and hygiene procedures being observed." [Doc. 65-4, ¶ 14]

Plaintiff relies on a letter from Dr. Obiefuna Okoli, who treated Plaintiff from December 2014 to May 2015 for MRSA, in which he states that "[b]ased on his clinical presentation, it is very likely he had contracted MRSA while at the detention facility." [Doc. 65-5, p. 4] However, at his deposition, Dr. Okoli stated "I think I was rather imprecise in the language" in his letter and that he "would like to change" his statement that it was "highly likely," to "say it is possible." [Doc. 65-5, p. 3] He further stated that, "without more information, more examination of his medical records before he went to detention and before he came to me, it's hard to say exactly where he got MRSA from." [Doc. 65-5, p. 3]

**ANALYSIS**

### *Standard Governing Summary Judgment*

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999) (internal quotation marks and citation omitted); *see also* Fed. R. Civ. P. 56(a), (c). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005) (internal quotation marks and citation omitted).

"Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Once the movant demonstrates no genuine issue of material fact, the nonmovant is given wide berth" to demonstrate that a factual controversy exists. *MacKenzie*, 414 F.3d at 1273 (internal quotation marks and citation omitted). The Court views the evidence in the light most favorable to the nonmovant. *Ward v. Jewell*, 772 F.3d 1199, 1202 (10th

Cir. 2014). "Unsupported conclusory allegations, however, do not create an issue of fact." *MacKenzie*, 414 F.3d at 1273.

"[T]he burden of proof [regarding causation] in medical tort cases requires . . . 'proof to a reasonable degree of medical probability,' *Alberts v. Schultz*, [1999-NMSC-015, ¶ 26], 975 P.2d 1279, 1286 (1999), which 'connote[s] proof that a causal connection is more probable than not,' *id.* at 1287." *Wilcox v. Homestake Mining Co.*, 619 F.3d 1165, 1169 (10th Cir. 2010).[2] With regard to expert opinions, a plaintiff

> cannot create a genuine dispute of material fact solely by relying on a conclusion that was written in an expert report and later qualified during that expert's deposition. A witness's later qualifications are the relevant "opinions" for purposes of summary judgment unless there is some reason for disregarding them.

*Talavera ex rel. Gonzalez v. Wiley*, 725 F.3d 1262, 1267 (10th Cir. 2013).

***Standard Governing a Claim of Deprivation of Substantive Due Process by an Individual Defendant***

"Although the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, . . . the Eighth Amendment standard provides the benchmark for such claims." *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) (citation omitted). "The Eighth Amendment requires jail officials to provide humane conditions of confinement by ensuring [that] inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." *Id.* (internal quotation marks and citation omitted); *accord Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To hold a jailer personally liable

---

[2] The Court applies New Mexico substantive law governing this tort injury case which allegedly occurred in New Mexico. *Wilcox*, 616 F. 3d at 1166.

for violating an inmate's right to humane conditions of confinement, a plaintiff must show 1) that the alleged deprivation was sufficiently serious, and 2) that the jailer acted with deliberate indifference. *Craig,* 164 F.3d at 495 (describing the "objective" and "subjective" components of an Eighth Amendment violation).

As this Court discussed in its prior *Memorandum Opinion and Order* [Doc. 28], several cases in our Tenth Circuit address whether exposure to human waste, in varying circumstances, is sufficiently serious to demonstrate a violation of the objective standard of the prohibition against cruel and unusual punishment. In *McBride v. Deer*, 240 F.3d 1287, 1290-92 (10th Cir. 2001), the Court held that an inmate stated a claim of violation of the prohibition against cruel and unusual punishment where the inmate alleged that he was forced to live in a feces-covered cell for three days with no access to cleaning supplies. The Court stated: "Not surprisingly, human waste has been considered particularly offensive so that courts have been especially cautious about condoning conditions that include an inmate's proximity to it." *Id.* at 1292 (internal quotation marks, citation and brackets omitted). In *DeSpain v. Uphoff*, 264 F.3d 965, 972-73, 974-75 (10th Cir. 2001), the Court held that 36 hours of exposure to a flooded cell block, which exposed the inmate to other inmates' urine and feces, along with the associated odor, and food potentially contaminated with urine and feces, was sufficiently serious to implicate constitutional rights. *DeSpain* lists several cases from other circuits supporting the proposition that "[e]xposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment." *Id.* at 974.

Our Tenth Circuit reasons that:

> [E]xposure to the human waste of others carries a significant risk of contracting infectious diseases such as Hepatitis A, shigella, and others. There is no requirement that an inmate suffer serious medical problems before the condition is actionable. *Helling* [*v. McKinney*], 509 U.S. [25,] 33, 113 S.Ct. 2475 [(1993)] ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life threatening condition in their prison on the ground that nothing yet had happened to them."). At the same time, the frequency and duration of the condition, as well as the measures employed to alleviate the condition, must be considered when considering the objective component.

*Shannon v. Graves*, 257 F.3d 1164, 1168-69 (10th Cir. 2001) (holding that inmate established evidence of the objective component of an Eighth Amendment claim where inmates regularly had to use blankets to clean sewage flooding, the blankets would not be adequately laundered and would continue to smell of sewage, and, when re-rinsed by the inmates, brown water would wash out). Thus,

> conditions such as a filthy cell, may be "tolerable for a few days." *Hutto v. Finney,* 437 U.S. 678, 687, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). However, "the length of time a prisoner must endure an unsanitary cell is [simply] one factor in the constitutional calculus"; equally important is "the degree of filth endured." *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994). In other words, "the length of time required before a constitutional violation is made out decreases as the level of filthiness endured increases." *Id.*

*McBride*, 240 F.3d at 1291. Finally, our Tenth Circuit acknowledges that it is "common sense that unprotected contact with human waste could cause disease" and that exposure to human waste is "unquestionably a health hazard." *DeSpain*, 264 F.3d at 974-75 (internal quotation marks and citations omitted).

As for the evidence necessary to establish that an individual defendant has acted with deliberate indifference, our Supreme Court requires that the plaintiff produce evidence of the defendant's subjective intent. *Farmer*, 511 U.S. at 837.

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* It is sufficient for an inmate to demonstrate that the defendant ignored an obvious, substantial risk of harm. *Id.* at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."); *Kellum v. Mares*, 657 F. App'x 763, 769 (10th Cir. 2016) (unpublished decision) (same). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

### *Whether Plaintiff Produced Sufficient Evidence to Create a Jury Question on Liability for Insufficient Living Conditions*

Plaintiff has produced sufficient evidence to survive summary judgment on a claim that he was exposed to constitutionally inadequate living conditions by being exposed to human feces on a regular basis for six months. As stated above, Plaintiff must submit sufficient evidence to create a genuine issue of material fact that 1) the living conditions were constitutionally inadequate, and 2) Warden Anderson acted with deliberate indifference.

As to the inadequacy of the living conditions, Plaintiff has produced evidence that he and other inmates were required to clean, without access to gloves or disinfectant products, the urine and feces of another inmate, which were smeared around the day room, shower, and other areas. [Doc. 66, p. 13] Jail staff provided only a dirty mop and a broom, without gloves, breach or a scrub brush, to the inmates, and there was no indication that there was any disinfectant or cleaning product in the mop water. [Doc. 66, p. 13; Doc. 65-6, p. 4] Plaintiff was exposed to such conditions for the six months of his incarceration at LCDC. [Doc. 65-6, pp. 3-4] While, unlike the facts in *DeSpain* and *McBride*, Plaintiff was not continuously in close confines with feces for a period of hours or days, here Plaintiff was regularly exposed to the feces over a period of six months, and forced to handle it without gloves or cleaning products. Given the sanitation concerns and damage to dignity resulting from such exposure to human waste, and given the long-term duration of the exposure, Plaintiff has produced evidence sufficiently serious to create a jury question on the inadequacy of the living conditions. *See, e.g., DeSpain*, 264 F.3d at 974-75.

Further, Plaintiff has produced evidence that Warden Anderson was deliberately indifferent to the fact that inmates, including Plaintiff, were exposed to human feces and required to clean it without cleaning supplies or gloves. As stated in the affidavit from Mr. Ogden, he complained to Warden Anderson about AH and having to clean up after him, after which Warden Anderson threatened to put him in segregation. [Doc. 66, p. 14] Warden Anderson then did put Mr. Ogden in segregation, and, "[w]henever they took AH out of Bravo, they would take me out of segregation and put me back into Bravo. When

11

they were ready to put AH back into Bravo, they would take me out of Bravo and put me into segregation again." [Doc. 66, p. 14] Even after being put in segregation, Mr. Ogden continued to talk to the Warden about AH, and complained that AH's behavior put other inmates in harm's way, but Warden Anderson told Mr. Ogden that he would not put AH in segregation because then his guards would have to clean up after him all of the time. [Doc. 66, p. 14] Finally, Mr. Ogden indicates that, after other inmates complained, for a period of about two months "guards would come by about once per week and spray bleach on the sinks and toilet and shower and then we would have to scrub it and clean it," however, then the guards again stopped providing bleach. [Doc. 66, pp. 14-15]

Mr. Ogden's statements indicate that not only did Warden Anderson know that inmates were required to clean up after AH, he punished at least one inmate (Mr. Ogden) who complained about it. These statements are sufficient to create a genuine issue of material fact as to whether Warden Anderson knew of and disregarded the fact that inmates were exposed to AH's human waste. As our Tenth Circuit has held, it is obvious that exposure to human waste creates a substantial risk to health. *Shannon*, 257 F.3d at 1168.

Accordingly, Plaintiff has proffered sufficient evidence to create a genuine issue of material fact as to whether he was forced to live in constitutionally inadequate conditions and whether Defendant Warden Anderson knew of the conditions and acted with deliberate indifference in not correcting the conditions.

*__Whether Plaintiff Produced Sufficient Evidence to Create a Jury Question on Liability of the MRSA Injury__*

Only Defendant submitted evidence regarding a link, or lack thereof, between exposure to human feces and the acquisition of MRSA, by submitting both the affidavit of Dr. Darouiche and deposition testimony, along with an unsigned letter, from one of Plaintiff's treating physicians, Dr. Okoli. Rather than submitting additional evidence, Plaintiff asks the Court to find that Plaintiff has submitted sufficient evidence of causation to present a factual question. [Doc. 66, pp. 4-5] Plaintiff argues that "his treating physician, Dr. Okoli, made the statement that he believes 'it is very likely' that plaintiff acquired MRSA during his incarceration at LCDC" and that, while "Dr. Okoli did move back from this statement during his deposition[,] . . . it would be in the province of the jury to decide which of his statements they wish to give credibility." [Doc. 66, p. 4] Further, Plaintiff submits that, because there was no evidence that Plaintiff had MRSA before being admitted to LCDC and the evidence shows that his "MRSA symptoms erupted, as it were, within three weeks after he was released from LCDC," he has produced evidence of causation. [Doc. 4] The Court disagrees.

Plaintiff submitted no evidence of causation (*i.e.*, that the conditions at LCDC caused his MRSA infection) to a reasonable degree of medical probability, as required in this medical tort case. *Wilcox*, 619 F.3d at 1169. The Court must consider that Plaintiff's expert refused, at his deposition, to endorse or reaffirm his statement by letter that "it is very likely [Plaintiff] had contracted MRSA while at the detention facility." [Doc. 65-5, pp. 3-4] Instead, Dr. Okoli stated "I think I was rather imprecise in the language" in his letter and that he "would like to change" his statement that it was "highly likely" to "say it is possible." [Doc. 65-5, p. 3] He further stated: "without more information, more

13

examination of his medical records before he went to detention and before he came to me, it's hard to say exactly where he got MRSA from." [Doc. 65-5, p. 3] In deciding whether Plaintiff submitted evidence that, to a reasonable degree of medical probability, Defendant caused his MRSA infection, the Court must consider Dr. Okoli's qualification of his earlier opinion. *Gonzalez*, 725 F.3d at 1267. Accordingly, Plaintiff failed to produce evidence that, to a reasonable degree of medical probability, he acquired MRSA from exposure to feces or any other condition at LCDC.

Further, while Plaintiff submits that, according to Dr. Banikarim's records, he did not exhibit symptoms of MRSA before entering LCDC, Defendant's expert counters that Plaintiff's medical records (including Dr. Banikarim's record, which pre-dates Plaintiff's incarceration by over two years) do not indicate that Plaintiff was tested for MRSA colonization. Defendant's expert opines, without contradiction, that MRSA can be dormant for years. Accordingly, Plaintiff failed to produce evidence that he was not already colonized with MRSA prior to his incarceration at LCDC.

In sum, Plaintiff has not submitted evidence that his MRSA infection was caused by Defendant Anderson. To the extent Plaintiff seeks damages related to his MRSA infection, summary judgment is appropriate.

### *Whether Plaintiff is Bringing a Claim Based on "Living Conditions"*

While Plaintiff failed to produce evidence that his MRSA infection was caused by the living conditions at LCDC, as discussed above, Plaintiff nonetheless produced evidence of constitutionally inadequate living conditions. Because exposure to human waste "evokes both the health concerns emphasized in *Farmer* and the more general

standards of dignity embodied in the Eighth Amendment," Plaintiff need not demonstrate that he became ill in order to establish a claim for constitutionally inadequate living conditions. *DeSpain*, 264 F.3d at 974-75; *Shannon*, 257 F.3d at 1168 ("There is no requirement that an inmate suffer serious medical problems before the condition is actionable.").

However, Defendant argues that Plaintiff, by email, agreed that "Plaintiff is not asserting a separate claim that his civil rights were violated by virtue of being housed in a cell which was purportedly unsanitary." [Doc. 65, pp. 1-2, 8-9] About a month before discovery closed, Defense Counsel sent Plaintiff's Counsel the following inquiry:

> Thanks for speaking with me today.
>
> This will confirm that per the Amended Complaint, Rule 26 disclosures and discovery answers, the only claim which Plaintiff is asserting is that he acquired MRSA at the jail and the damages that flow from that diagnosis. Please confirm if my understanding is correct.

[Doc. 65-1, p. 4] Plaintiff's Counsel responded:

> I confirm your understanding. I see no basis in the pleadings I have filed where I can bring a claim on his behalf for any other purpose. After your 12(b)(6) motion was heard, the court has left only one claim standing, and that is the claim for him contracting MRSA at LCDC.

[Doc. 65-1, p. 3] Defense Counsel submitted these emails to the Court attached to an affidavit sworn out by Defense Counsel, Adam Rafkin, attesting that "[t]he email attached to this Affidavit as Exhibit '1' is a true and correct copy of the email string between myself and opposing counsel." [Doc. 65-1, p. 1, ¶ 2]

In his response to the *Motion for Summary Judgment*, Plaintiff argues that the Court should ignore the affidavit and email string because "Defendant's counsel is not a

witness in this matter. Defendant's counsel cannot testify at trial." [Doc. 66, p. 2] Plaintiff further argues that "if plaintiff's counsel attempted to respond to defendant's counsel's affidavit, or to refute it or explain it, it would further compound an already defective attempt at introducing improper evidence or argument before the Court." [Doc. 66, p. 2]

The Court is not persuaded that it was improper for defense counsel to submit an affidavit attesting that an email string between himself and opposing counsel was true and accurate. Nor is the Court persuaded that it cannot consider the contents therein to determine whether Plaintiff is making a claim based on allegedly inadequate living conditions. Nonetheless, the Court is not persuaded by Defendant's argument. As Defendant acknowledges, the "*Amended Complaint* is replete with references to a pod-mate's purportedly filthy habit of smearing feces around the pod." [Doc. 65, p. 9] In addition, in ruling on Defendants' *Motion to Dismiss*, the Court discussed at length the living conditions, which were analyzed as the alleged mechanism for Plaintiff's MRSA injury. [Doc. 28, pp. 5-10] Further, in responding to the present *Motion for Summary Judgment*, Plaintiff continues to rely on the living conditions as essential the basis for liability for any damages. [Doc. 66, p. 11]

Based on this historical review of the pleadings, rulings, and arguments, two things become clear. First, Plaintiff has always claimed that his living conditions were inadequate due to the repeated exposure to human waste without protective gear. Second, as to his theory of liability for MRSA, Plaintiff would have had to prove the constitutionally inadequate living conditions. Thus, as a matter of logic, as long as

16

Plaintiff pursued the MRSA claim, evidence concerning the inadequate living conditions was relevant and at issue. Accordingly, under these circumstances, despite Plaintiff's Counsel's agreement with Defense Counsel's assertion by email, the adequacy of the living conditions has always been an issue in this case.

Further, at no point in these proceedings did Plaintiff formally, by submission to the Court, abandon a living conditions claim. Barring prejudice to the opposing parties, generally a plaintiff has through the pre-trial order to establish his or her "claims, issues, defenses or theories of damages." *See Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim."). In sum, in the absence of authority indicating the Court should hold otherwise, the Court is not inclined to find that Plaintiff abandoned his living condition claim, which he necessarily must have proved to demonstrate that, as Defendant puts it, Plaintiff "acquired MRSA because of the conditions of his confinement." [Doc. 67, p. 6]

**CONCLUSION**

**WHEREFORE** the Court hereby **GRANTS IN PART** and **DENIES IN PART** *Defendant Arthur Anderson's, in his Individual Capacity, Opposed Motion for Summary Judgment*. [Doc. 65] The Court **GRANTS** the *Motion* with respect to Plaintiff's claim for damages from acquiring MRSA. The Court **DENIES** the *Motion* in all other respects.

**SO ORDERED** this 6th day of April, 2018 in Albuquerque, New Mexico.

_____
M. CHRISTINA ARMIJO
United States District Judge